UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 08-2745-BLG

UNITED STATES OF AMERICA

vs.

ALEXIS RAMOS,
RAUL RAMOS, JR.,
MANUEL CAMEJO,
GEORGE MORALES and
GERMAN GALVEZ,

   Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the United States Attorney's Office prior to April 1, 1999? ___ Yes  _X_ No
If yes, was it pending in the Central Region?
___ Yes ___ No

2. Did this matter originate from a matter pending in the United States Attorney's Office prior to April 1, 2003? ___ Yes _X_ No

3. Did this matter originate from a matter pending in the Narcotics Section (Miami) of the United States Attorney's Office prior to May 18, 2003? ___ Yes _X_ No

4. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? ___ Yes _X_ No

5. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? ___ Yes _X_ No

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By: _____
CRISTINA V. MAXWELL
Assistant United States Attorney
Florida Bar No. 029361
11200 NW 20TH Street, Suite 101
Miami, Florida 33172
Tel: (305) 715-7641/ Fax: (305) 715-7639

# United States District Court

SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

V.

ALEXIS RAMOS, RAUL RAMOS, JR.,
MANUEL CAMEJO, GEORGE MORALES and
GERMAN GALVEZ

**CRIMINAL COMPLAINT**

CASE NUMBER: 08-2745-GARBER

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about February 2007 thru June 3, 2008 in Miami-Dade county, in the Southern District of Florida defendant(s) did, (Track Statutory Language of Offense) conspire to possess with intent to distribute and possess with the intent to distribute a controlled substance, that is, fivde kilograms or more of cocaine,

in violation of Title 21 United States Code, Section(s) 846 and 841(a)(1).

I further state that I am a(n) Special Agent Spencer Dunn and that this complaint is based on the following facts:
Official Title

See Attached Affidavit

Continued on the attached sheet and made a part hereof: ✓ Yes ☐ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

June 4, 2008                                         at     Miami, Florida
Date                                                         City and State

Barry L. Garber, United States Magistrate Judge      _____
Name & Title of Judicial Officer                     Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Spencer Dunn, being duly sworn, depose and state as follows:

1.      I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Miami Field Division. I have been a Special Agent for approximately three years. As a Special Agent with DEA I have been assigned to a High Intensity Drug Trafficking Area (HIDTA) Task Force. While assigned to the HIDTA Task Force I have been involved in numerous complex investigations involving the trafficking of narcotics and the money laundering that is associated with the trafficking of narcotics. As a Special Agent I have worked with Senior Special Agents who have extensive training and experience investigating narcotics trafficking and money laundering. Prior to becoming a Special Agent with DEA, I attended the DEA Training Academy where I received extensive training in criminal investigations including narcotics trafficking and money laundering. Prior to my employment as a Special Agent with DEA, I was employed as a Police Officer for seven years in Atlanta, GA.

2.      This affidavit is based upon information obtained by my own investigation as well as information provided by other law enforcement officers. This affidavit is submitted for the sole purpose of supplying probable cause for the arrest of Alexis RAMOS (hereinafter referred to as "RAMOS"), Raul RAMOS Jr. (hereinafter referred to as "RAMOS Jr."), Manuel CAMEJO, a/k/a "Manny" (hereinafter referred to as "CAMEJO"), George MORALES, a/k/a "Dee," (hereinafter referred to as "MORALES"), and German GALVEZ, a/k/a "Nelson" (hereinafter referred to as "GALVEZ") for conspiracy and attempt to possess with the intent to distribute five (5) kilograms or more of cocaine.

3.      In February 2007, the DEA began an investigation into the drug trafficking activities of RAMOS and RAMOS Jr. Agents subsequently sought and

1

obtained an order to intercept wire communications occurring over RAMOS' cellular telephone. Agents have obtained numerous orders to intercept the wire communications occurring over the cellular telephones of RAMOS, RAMOS Jr., and CAMEJO during the course of this investigation. Based on these wire intercepts, numerous Confidential Source (CS) debriefings, and surveillances, agents learned the following about the above listed subjects: RAMOS is the leader of a drug trafficking organization (DTO) responsible for transporting and distributing multi-kilogram loads of cocaine from the Houston, Texas area to the Miami, Florida area. RAMOS Jr. is responsible for the transportation aspects within the DTO. CAMEJO and MORALES are cocaine distributors who receive their cocaine directly from the DTO. GALVEZ is a truck driver responsible for transporting the cocaine via concealed compartments within tractor trailers from Houston, Texas to Miami, Florida.

   4. During the month of May 2008, agents learned from wire intercepts that RAMOS Jr. was negotiating with an identified source of supply (SOS) in Houston, Texas for approximately 20 kilograms of cocaine. After negotiations with the SOS, RAMOS Jr. was intercepted speaking with CAMEJO about the price per kilogram of cocaine that CAMEJO planned on purchasing from the DTO. CAMEJO was then intercepted relaying the information to his partner MORALES. After learning the price per kilogram of cocaine, CAMEJO was frustrated and placed a telephone call to RAMOS. CAMEJO pleaded with RAMOS to help out with the price of cocaine as suggested by RAMOS Jr. CAMEJO advised RAMOS that he (CAMEJO) intended on purchasing approximately $80,000.00 worth of cocaine

from the DTO and just wanted some relief from the price increase.  Subsequently, RAMOS and RAMOS Jr. discussed in detail this price increase and how it affected CAMEJO.

5. On May 27, 2008, agents learned that GALVEZ was in Houston, Texas awaiting authorization to receive the cocaine from the SOS in Houston, Texas.  On May 30, 2008, RAMOS Jr. advised GALVEZ that he (RAMOS Jr.) had paid the SOS in Houston, Texas the previous day.  RAMOS Jr. and GALVEZ then discussed obtaining a legitimate "cover load" before departing from Houston, Texas with the cocaine.  On this same date, the wire intercepts revealed that GALVEZ had secured the shipment of cocaine and was returning to Miami, Florida.  Agents obtained a pen register order for the cellular telephone of GALVEZ in order to track the return trip of GALVEZ.  Agents utilized "real time ping" data to confirm GALVEZ's travel. During GALVEZ's return trip, numerous phone calls were intercepted between CAMEJO and MORALES, in addition to other unknown co-conspirators.  These conversations all indicated that CAMEJO and MORALES were awaiting the arrival of a pending shipment of cocaine.

6. On June 3, 2008, at approximately 11:00 a.m., agents intercepted a telephone call between GALVEZ and RAMOS Jr.  GALVEZ advised RAMOS Jr. that he (GALVEZ) was unloading in Ft. Pierce, Florida and would be arriving at RAMOS Jr.'s location at approximately 2:00 p.m.  Agents located GALVEZ driving south on the Florida turnpike in the Pompano Beach, Florida area and maintained surveillance of GALVEZ as he (GALVEZ) traveled in the direction of the residences of RAMOS and RAMOS Jr.  GALVEZ was subsequently stopped by the Florida

Highway Patrol for a traffic violation. GALVEZ gave written consent to search the tractor trailer and advised the agents that he (GALVEZ) was in possession of "twenty pieces" in a hidden compartment on the tractor trailer. Agents located and seized approximately 22 kilograms of a white powdery substance, that field tested positive for cocaine, wrapped in 20 brick-shaped packages from within a concealed compartment on the tractor trailer.

7. During the traffic stop and search of GALVEZ's tractor trailer, agents continued to intercept the conversations between the DTO members. Agents were also conducting surveillance on several members of the DTO who were conducting extreme counter-surveillance measures and were openly discussing the fact that they were being followed over the wire intercepts. In one particular conversation between CAMEJO and RAMOS, CAMEJO advises RAMOS that he (CAMEJO) is in possession of approximately $80,000.00 to $100,000.00 collected from buyers. CAMEJO advises RAMOS that he (CAMEJO) is prepared to take his wife and daughter and "skip out" with the money. Agents then intercepted calls that indicated that the DTO members were switching phones because of how suspicious the traffic stop of GALVEZ was. The telephone conversations began to diminish greatly and the decision was made to arrest RAMOS, RAMOS Jr., CAMEJO, and MORALES.

8. GALVEZ was advised of his Miranda rights in English. After waiving his rights, GALVEZ admitted that he was transporting approximately 20 kilograms of cocaine for the "brothers" (believed by agents to be RAMOS and RAMOS Jr.). GALVEZ also stated that he has previously transported five loads of cocaine for the

DTO within the last year. GALVEZ was paid $500.00 per kilogram of cocaine for transportation costs. Each of the loads was between 15 and 25 kilograms of cocaine and was received from the same Mexican SOS in Houston, Texas. GALVEZ delivered each of the shipments to the same truck stop across the street from a Home Depot in Hialeah Gardens, Florida.

9. MORALES was advised of his Miranda rights in English. MORALES stated he understood his rights. After MORALES acknowledged he understood his Miranda rights he agreed to speak with agents. MORALES admitted to discussing the price of cocaine with CAMEJO over the telephone.

10. Based upon the foregoing information, your affiant asserts that probable cause exists to believe that RAMOS, RAMOS Jr., CAMEJO, GALVEZ, and MORALES conspired and attempted to possess with intent to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Sections 841 (a)(1) and 846.

Spencer Dunn
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this ____ day of June, 2008.

BARRY L. GARBER
United States Magistrate Judge
Southern District of Florida

5